Thank you, Your Honors, and may it please the Court, Paul Hoffman for the plaintiffs, the Vos family. And with the Court's permission, I would address the District Court's finding about objective reasonableness as a matter of law and then turn to the qualified immunity question that the Court has identified. And one of the reasons for handling it in that way is that the District Court's decision about objective reasonableness also impacts all of the other claims that the District Court dismissed because of that finding. Our position is that this was a case where it was clear that nonlethal force should be used. It was not a split-second kind of case. It was a case where there were 10 officers at the scene. They were there for a long period of time before the tragic events at the end of the situation that led to Mr. Vos losing his life. In addition to the overwhelming force that they had, the 10 officers had tasers. There was a canine unit. They had put their police cars in a defensive position so they had cover with armored car doors. There was a 40-millimeter, at least one 40-millimeter lethal, nonlethal weapon that was deployed, possibly a second one. They had discussed what would happen. They knew there was no gun. They knew at most Mr. Vos had scissors and was acting out. They believed or at least had information that he was not acting out, had acted out, and had caused a wound to one of the clerks. True. Absolutely. There's no question that that happened. But they also knew that from the way he was acting and talking to people who weren't there and the other kinds of actions that he took, that he was at least likely to be mentally disturbed, meaning under this Court's cases that ordinarily less intrusive means would be used and other means would be used to talk him down. You just mentioned other court cases. Why isn't this case very similar to Lal, L-A-L, versus California? Well, I think the reason it's completely different from Lal is that in Lal there's a car chase. He commits certain kinds of acts on the way to the final ending, and the decedent in Lal has a football-sized rock six feet away from the officers with no nonlethal alternatives available. They'd call, but they weren't there. And this was a more immediate threat, and I think immediacy is really the key here. Well, here, though, your client was in a back room, I guess, after having displayed very uncertain sort of behavior, threatening behavior to others in the store, and the clerk was wielding a knife. Well, scissors. Scissors. I'm sorry. You're right. Scissors. I was thinking of another case. And then when he came out, he came out at full speed, you know, towards the officers who were lined up there to try to prevent, I guess, other people from being hurt. I don't think that that part's true. I think that all the bystanders were well away from there. There was no bystander situation. It was all the police officers at the front of the – they had gotten people out of the way. So they're standing there with their cars, but he comes running out at full speed. Why wasn't that an immediate threat, especially in light of the Supreme Court's recent case in Cancela? Well, I think that, first of all, Cancela obviously deals with qualified immunity as opposed to the underlying Fourth Amendment issue. And I think that our position is not that it was not immediate as a matter of law. Our position is when you take all these factors under the court's cases that a jury should decide there was a tribal issue of fact about whether there was an immediate threat justifying the use of deadly force at that point. Mr. Hoffman, can I read you a quotation from Justice Holmes and see if you can distinguish what he said from the case that is portrayed in the video? Detached reflection cannot be demanded in the presence of an uplifted knife. Therefore, this court at least is not – it is not a condition of immunity that one in that situation should pause to consider whether a reasonable man might not think it possible to fly with safety or disable his assailant rather than kill him. Wasn't your – was Mr. Voss running at the officers with an uplifted scissors in his hand? Well, actually, it was a shelving hook. It was not actually a scissor. Oh, a shelving hook. But it's not clear that that was the same kind of thing as a scissors or a knife. I mean, but put that aside, I mean, I think that the difference – Can you tell the difference when he was running at you whether it was a scissors or a knife? Well, he was running, first of all, from where he began was 60 – They understood it to be a dangerous item either. I thought they reported it as a scissors. Well, I think that they had reason to believe that it might be a scissors given what happened before. So I'm not – And it was reported to them that someone had been cut. Is that right? Yeah, and in fact, it was a relatively small cut, and the clerk was able to report it to him. I mean, I'm not trying to justify a cut. I'm just saying that it was not like he stabbed some – I mean, there was a – the clerk tried to get the scissors away from him, and there was a cut. There's no question that that happened. And there's no question that Officer Kresge got some information about how he was behaving at the time and that he was behaving in an unusual – looking like a mentally disturbed way. One of the other officers said, is this crazyville kind of thing at the scene. The point I'm – immediacy is an important issue. I agree, Your Honor, that if, in fact, Officer Kresge came to the door right away and was confronted with Mr. Voss with a hook or scissors or whatever it was right there, he could have shot him to death. No question about that. As in law, if he had a football-sized rock six feet away, there's no question that he could do that. What happened here, though, was different. They had 15 minutes to get into formation, to give themselves cover, to come up with a plan. The plan was to use nonlethal weapon. That was the plan. They said, if he comes out with the scissors, we're going to shoot him with the 40 millimeter. And what happened is he comes from 60 feet. So it's not right there. It's 60 feet. He's in the store when he's shot with the lethal rounds. The lethal rounds are shot simultaneously, according to the testimony, with the nonlethal round. So they don't even wait to find out if the nonlethal round has stopped him. He's being shot at basically at 25 feet with a nonlethal weapon, which would have stopped him, and they had 10 tasers and a canine unit. They didn't have to wait for him to come in the way that Justice Holmes is talking about. They had cover. They had a plan. And under the court's case, if there's a clear, reasonable, less intrusive alternative, starting with we've cited Brower, we've cited Glenn, and there are other cases where, at least for the Fourth Amendment analysis, if there's a clear, reasonable alternative to deadly force, which there was here, a jury should decide whether it was objectively reasonable under all the Graham factors to decide that. Now, if I can turn to the qualified immunity issue, I think that that... Well, before you get there, you said they had a plan? Well, at least if you look at the evidence in the most favorable light to us, Pressmeier said, if we're concerned about him coming out with the scissors, if he comes out, we're going to shoot him with a 40-millimeter. And, in fact, Pressmeier says, when he comes out, shoot him. And the testimony is that it's shoot him to Officer Shen, who's the guy with the 40-millimeter. Now, there's some dispute about whether the two officers, Ferris and Henry, heard that or whether they shot in response to that, but that was the plan. The plan was nonlethal. And, in fact, I mean, if you look at the negligence question, for example, under Hayes, there's no question that under Hayes, it's a jury question as to whether the pre-shooting conduct and whether giving an order to shoot rather than making clear that it's to the nonlethal person rather than the two guys that have AR-15s, these are issues that a jury could find that their pre-shooting conduct led to a death that was unnecessary. How does Scott versus Harris fit with what you're arguing? This whole thing is on video. Yeah, no, I mean, there's no question it's on video. I mean, the jury could take a look at what that was and decide whether it was objectively reasonable for two guys to shoot somebody to death when the plan was to shoot them with a nonlethal and when there were all these other alternatives, including shields, cover, tasers, canine unit. They had it all worked out so that Mr. Voss didn't have to die. And yet, how close would you say Voss had to get to the police officers with his hook before they would be justified in shooting him dead? I think that if in fact they ordered the 40-millimeter person to shoot, if he actually had not slowed down, they still had three or four seconds at least before... Three or four seconds, let's talk about he was running at full speed, right? Right, full speed, he still would have been three or four seconds. Ten miles an hour? That's what their experts said. Their experts said it would have taken him 3.4 seconds from the time... From the back of the store? No, no, from where he was shot. That's what they said. 30 feet, three or four seconds? That's what their expert says. It's 1.5 feet per second. I mean, 15 feet per second at 10 miles an hour. Well, anyway. I mean, it probably is more than that. And in fact, if you get hit with a nonlethal, it should slow you down. And if it doesn't slow you down, you also have all these tasers. I mean, I don't disagree. If he kept coming and the nonlethals didn't slow him down, they had plenty of time. They had ten guys with two guys with AR-15s, and the rest of them had their office revolvers. And Kresge had his out. There was plenty of time before he reached the doors before they could kill him. And if he kept going, they could have killed him. I agree with that. But I think it's a jury question both on the underlying Fourth Amendment violation and the negligence claims and the Bain Act and all of the things that turn on objective reasonableness. I don't think that the court was right to say that based on the fact that you see this video with a guy running, that that's the end of the story, that that, as a matter of law, means it's not a Fourth Amendment violation. I think this court has a much more sophisticated analysis about immediacy, about what the nature of the crime is. It was not a serious crime under the court's analysis. So I think a jury should have been entitled to do that. And, of course, that leaves Kinsella v. Hughes and qualified immunity, which, of course, only really applies to the Section 1983 claim, not all the other claims, because the California claims are not governed by qualified immunity, nor is the ADA claim under the second prong of Sheehan. And what I would say on qualified immunity is that there is a line of cases in this court that we have cited to you about where there are clear, reasonable alternatives to using deadly force that those steps should be taken before a life should be taken. And I think that that should have put them on notice that they should not have taken away the nonlethal option when they shot them. There was a plan. They were going to take him down with a 40-millimeter, and these two officers preempted that by killing him. I'd like to save two minutes for that. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Daniel Behrer for the officers in the city of Newport Beach. And I agree that the case that's most pertinent to this and this Court's jurisprudence is the Lowell v. Sacramento case, including the fact that in Lowell the plaintiff tried to defeat summary judgment by presenting an expert's declaration saying the officers should have pursued different strategies because they were dealing with an obviously mentally disturbed person who kept asking the police to kill him, and they should have used nonlethal alternatives, et cetera, much the same arguments as are here. The main differences between Lowell and this case are that there were more officers here than in Lowell, and in Lowell he was walking towards the officers. In this case, Mr. Voss was running. Does it bear that they had nonlethal options? It's a relevant factor within the use of force, and they attempted the nonlethal alternative. It was at the same time as the shooting. But what happened? How did they attempt the nonlethal? It seems like they were pretty casual in terms of gathering the officers outside. We're saying, oh, we've got somebody. He's back there. He may have scissors. And then the one officer, I can't remember his name, is saying, hey, if he comes out, let's do the lesser force. Tell him the officer who has the lesser gun. I can't remember what it was. Liz Shin. Yeah, okay. And then the dog. And everybody seemed to be in agreement. So what happened? How did the plan go wrong here? Well, I wouldn't say the plan did go wrong because what the videos say. Well, but the officer later testified and said, yeah, I didn't mean for everyone to shoot. Yes. Even though I said shoot, I only meant, you know, basically what he was saying, I only meant that the officer who we had said would shoot the less lethal force. So I'm trying to figure out how does that, what do we do with that? Well, if you, the videos show that what they said was, and this is looking at Video Exhibit 11, between two minutes, 15 seconds and two minutes to 40 seconds, they discuss verbalizing the guy out, giving him a bunch of opportunities. If that fails, if that fails, he gets the 40 millimeter K-9. If he comes running out with scissors, don't want to be behind the curve. He's already 314. He's already cut somebody. And there's also, they're talking about if he comes out with hands down. Yeah. If he comes out with scissors, we don't want to be behind the curve. Yeah, but he also said, let's do the lesser force, you know. And so what happens? And what happens when that didn't execute? I mean, and instead when he said shoot, and then everybody shoots. I think understandably everybody shoots when he says shoot, but I'm not sure everybody heard. It just seemed like the plan went very, very wrong to the extent they could call it a plan. It was kind of very casually discussed. Well, the reasons why Officers Henry and Officers Ferris shot, and I disagree with Mr. Hoffman, there isn't an issue of fact on this. This is from the officer's testimony. They feared for themselves and their fellow officers unless they used the AR-15. Officer Ferris testified, and there's no contradicting evidence. Where is that clear? I mean, where is that clear? I mean, you're not saying that based on any discussion. I'm saying that based on the officer's deposition testimony. Which officer was that? I'm trying to remember. The officer who was supposed to be the lead had said, this is how we're going to approach it. And so he never said we're going to start with the most lethal force. That's correct, Your Honor. The two officers who shot are the two defendant officers who were left, Officers Ferris and Officer Henry. Officer Ferris testified in deposition he did not hear the order shoot him. That's at 1 supplemental excerpts of record 4, 5, and 7. Henry testified he heard it but did not act on it. Second excerpts of record 131, 132, and 163. Henry fired because he was scared Voss was coming to kill him or one of the other officers. To SER 147163. Ferris was afraid Voss would kill him or his partner. SER 1182119. So the reason why these officers fired and... Weren't there other officers who didn't fire? There were other officers who didn't fire. It's the same thing in Hughes v. Casella. One officer dropped to the ground and fired. But that's... We don't want to have a Fourth Amendment standard where every officer has to feel the need to fire or else the use of force is unreasonable. Also, I have to point out that the fact... The question of whether the officers fired in response to, quote, shoot him, unquote, is irrelevant both to the Fourth Amendment cause of action and to the California negligence cause of action. It is irrelevant to the Fourth Amendment cause of action because it's been established from Graham onward at least that the officer's subjective motivation is not what defines liability. It's the objective reasonableness of whether an objective officer in that standard would perceive an immediate threat and the other Graham standards. And under California jurisprudence, as described in the California Supreme Court case of Hayes, the Fourth Amendment standard applies to negligent use of force. It only embraces a wider array of behaviors because you don't need the intentional act. You can have negligence and you can consider factors before the shooting, whereas the Fourth Amendment focuses on the time between the threat arising and the time that the lethal force is used. But in this case, there's 10 officers there. Eight of them do not shoot. Was that reasonable? If it was reasonable for an officer to... But you have eight of them. Everything that went on, eight of them were armed. They had tasers. They had firearms. And eight of them did not shoot. And you say that's reasonable. Two of them shot. And you say that's reasonable. How do you reconcile those things? And if you can, tell me, when would an officer not be protected by qualified immunity when they shoot and kill somebody? Well, I'll answer the first question first. These two officers were armed with the AR-15 rifles. Other officers were armed with pistols. They had arranged themselves strategically. And for two officers armed to fire while other officers did not certainly does not take away the rule that a reasonable officer faced with these people coming could shoot. A reasonable officer could not shoot. Those officers were behind police car doors or the cars themselves? Yes. It would have been very hard for Mr. Voss to get to them. In the seconds that he was running out to them, they didn't have to wait for him to wind his way. Now, the three to four seconds that my colleague talked about, that's from running towards the doors and reaching the officers. The pace was much faster as he was approaching the doors, as the videos show. And they didn't have to wait for him to wind his way around the various officers, including the ones that were closest, and stab whoever was available. The Fourth Amendment does not call upon officers to risk their lives or safety to avoid using lethal force. Neither does... Doesn't that raise fact questions about under the circumstances here? That's the only issue. That video, does it unequivocally establish your understanding? And the plaintiff's view is, no, there are a lot of questions. And isn't that for a jury to determine and not for a court to declare as a matter of law what they did was reasonable? Under Scott v. Harris, if the facts, the historical facts of what happened are established, you don't follow the rule that you view the facts in the light most favorable to the plaintiff. You view the facts in the light most favorable to the obvious record here, the video.  generally cases where the... Of what happened below is in question, where one officer has a version and others don't. The case that's focused on in the reply brief, Lozano, is one where the video and all the other officers said that this suspect had his hands behind his head when he was shot, and the shooting officer said, no, he was assuming a shooting stance. Now that's an issue of fact that should go to the jury, and this court so ruled. Here, the historical facts are established. Even some of the questions of fact that they say exist in the reply brief aren't questions of fact. For instance, they say that it's a question of fact whether they tried to communicate with him. Whereas in their response to the separate statement in support of summary had picked up the microphone to the PA system to prepare him to communicate with him. Can you answer Judge Malloy's first question on why was it reasonable for two officers to think it was okay to shoot and the other eight to think it wasn't okay to shoot? Those officers were... How do you reconcile this, and does that create the issue that you're talking about right now? It does not create an issue. The only question is whether a reasonable officer in that position, as opposed to these particular officers and the decisions they made, whether it was reasonable for that officer to shoot or not to shoot. Scott versus Harris says that when the underlying facts are undisputed, that's a question of law for the court, not a question for the jury. I want to answer... Before you go to another subject, how would you deal with Mr. Hoffman's suggestion that unqualified immunity, that is a defense to the 1983 claim, but not to the California negligence and ADA claims? That's absolutely correct, Your Honor. And then to address Kissela versus Hughes, that's only going to, as Mr. Hoffman says, address the Section 1983 causes of action. It's not going to address the other two, which is why we would have to address both that and whether the use of force was reasonable as a matter of law, because as I've mentioned, that's relevant to California negligence. And also, under the Sheehan Title 2 ADA claim, if we're going to keep... Under Ninth Circuit precedent, we do have to keep applying it, but since the Fourth Amendment analysis has to take into consideration whether the person upon whom force is to be used is mentally disturbed, it's a factor they have to consider. There really doesn't seem to be a difference between the Sheehan Title 2 analysis and the Fourth Amendment reasonableness analysis when the question is use of force rather than arrest. But going to Hughes versus Kissela in this court and then Kissela versus Hughes, it's obviously very relevant because it's cited throughout plaintiff's briefs as an example of unreasonable use of force. And it's hard to answer Judge Malloy's question to say what use of force would not be subject to qualified immunity under that case unless there was a case directly on point, either from the Supreme Court, this court, or a robust body of authority, as the Supreme Court said in Wesby and Al-Qaeda, that established an officer had violated the Fourth Amendment by using that use of force because in Kissela, the woman was standing with the knife at her side, not making any threatening gestures. She was six feet away from what turned out to be her roommate. She was not guilty of any crime. She had been hacking up a tree, which is unusual but not a crime, and an officer, still without giving any warning, dropped to the ground and fired under the fence and killed her. That seems to be the outer continuum, even to me, of where you would use qualified immunity, certainly more extreme than here where Mr. Voss was running with a pronged instrument in his hand, raised as if to stab, and all the officers who commented on it thought he had scissors. I just want to make sure I understand. How much, in your view, are we to look at the events that occurred that Mr. Hoffman highlighted, let's say, right just up until before the individual came running out? I mean, in terms of what the officers were doing, that they didn't communicate and they didn't come up with a better plan. Do we look at that? I think to the extent you look at it, you look at how patient they were beforehand. As in law, they were waiting. They didn't go in, they didn't invade. They waited while they took all the measures that Mr. Hoffman said they should have taken, including trying to communicate, after which they could have called in mental health professionals or a SWAT team or whatever. Mr. Voss forced the matter. To the Fourth Amendment claim, it's irrelevant because what you look at is the space of time between Mr. Voss running out of that back room  and the officers using force to end the threat. So if I understand your answer to Judge Merguia's question and my earlier question, qualified immunity is absolute immunity. It's not absolute immunity if there's case law on point, either from the circuit or the Supreme Court or a robust body of authority telling a reasonable officer at that time that doing that under those or similar circumstances violates the Fourth Amendment. And so the level of generality is inapplicable. It has to be on all fours before you could have qualified immunity. It does not have to be on all fours. It has to be similar precedent that's strong enough to put beyond debate that an officer doing what that officer did violates the Fourth Amendment. And you couldn't tell me when an officer is not protected by qualified immunity. There's this standard out there that if it's obvious then they're not protected by the Fourth Amendment. This Court has said it's a rare situation. The Supreme Court has said in Wesby that's a rare situation and it's a high level to meet and I can't tell you after Hughes v. Gossela what would meet it. Thank you very much. Thank you, Your Honor. Just a few quick points. One, I think, is that the issue for the jury under the Fourth Amendment is whether Officers Farris and Henry's subjective fear was objectively reasonable. And in order to do that under this Court's cases, you take into account issues relating to the severity of the crime, whether the person is mentally disturbed, are there nonlethals. There's a whole set of cases about that which the district court ignored, basically, by finding that as soon as you have a tape of this person running that that was dispositive of that. And I think that was error. A jury should decide all those issues and decide if it was objectively reasonable under all the factors that this Court has indicated. And the video itself is not, as a matter of law, dispositive. The Scott case does not stand for the proposition that videos are dispositive. In fact, very few cases have done that. In Scott itself, the reason that Scott came down the way it did and altered the normal summary judgment ruling was that in Scott the plaintiff made an argument about how he was driving normally and wasn't putting anybody at risk, and the videotape completely rejected that. It blatantly contradicted the plaintiff's story. The video, in this case, is part of the story. It's not the whole story. It's part of the story. It's part of all the other factors that a jury would look at. With respect to qualified immunity, Kinsella v. Hughes, and I certainly don't really know what the Supreme Court is doing on qualified immunity in terms of where that ultimately lands, but Kinsella is more of a law case. An officer comes at the last minute. There are two other officers on the scene that are not shooting. An officer comes at the last minute. He sees a woman with a very big knife six feet away from somebody else that he thinks is in danger, and he shoots believing that there's an immediate threat to that person. And that turned out to be wrong, but it was not a... There was nothing that showed him that... If the officer in Kinsella is covered, why wouldn't these officers be? Well, I think the reason that it's not is the completely different circumstances that I outlined before. In other words, this is not... They're already there. They know what the situation is. It's not somebody coming at the last minute and confronted with a threat. It's someone running that they know is mentally disturbed, that had his scissors, they know he doesn't have a gun. He runs to the front. They've got a plan. They've got the 40-millimeter ready. They tell them to shoot it, and these officers preempt what was a perfectly reasonable nonlethal plan of action that would have preserved this young man's life in all likelihood. They decide, because of a subjective fear, even though they're behind armored cars with ten officers and tasers and a canine unit right there, they decide to shoot their weapons. Now, there's an issue of fact in the negligence question about whether, in fact, they shot because they were told to shoot. These are two Marines that had done duty in Iraq, and maybe when they hear shoot, that's what they did. And that would be a negligence claim in and of itself. If there wasn't a careful consideration of when Pressmeier says shoot, telling them in advance, not you guys, I mean the nonlethal guy, to try to deal with this. Our expert laid out all sorts of reasons under the Newport Beach Policy Manual and training about all the things they did wrong in this situation that would lead to a negligence finding under Hays, and I think also supports the fact that this was not objectively reasonable. And on qualified immunity, all I can say is that this court has been very clear, I think, over a long period of time to say that when there are clear, reasonable, less intrusive alternatives to killing somebody, that those need to be used. And any reasonable officer would know that. They're trained that taking somebody's life is the last thing that you want to do as a police officer. I mean, they're all trained that way. Thank you very much, Mr. Hoffman, and we've taken your questions. Thank you. The case of Voss v. City of Newport Beach will be submitted.
judges: Bea, Murguia, Molloy